Your Honor, Janice Boback. I represent the appellant, Nelida Rangel. Good morning, judges. Roberto Madera, NAD, ERA, on behalf of Mr. Cisneros, respondent at the link. Okay. Good morning. We've allotted 30 minutes for this case, and that time will be divided equally between both sides. The appellant can reserve some of its time for rebuttal. And with that, you may begin. Thank you, Judge. Good morning, Justice Epstein, Justice House, and Justice Levin, counsel. May it please the Court. Again, my name is Janice Boback from Anderson & Boback. We're here on behalf of our client, the appellant, Nelida Rangel. We're here today on a case that our office refers to as the 40-year-old support case. Mr. Samuel Cisneros, the appellant in this case, testified in court without hesitation that, in fact, he paid no support or maintenance to his ex-wife, Nelida, since 1971. At that time, the party's son was about four years old. Today, Gilberto, the plaintiff, is about 47 years old. And that lapse of time is what brings us before the bench today. In January of 1970, a judgment for disillusion of marriage was entered. It was entered by default. Mr. Cisneros had participated in the litigation. However, he didn't participate at the end, and a default judgment was entered against him. He was ordered to pay $20 in maintenance, or alimony it was called at the time, and $15 in child support. In 1971, he made his last payment. And what's significant in this case is that in 1989, he moved to the state of Texas. Ms. Rangel found out in 2011 his whereabouts. She found out through her daughter-in-law that he was, in fact, in the state of Texas. She had contact with him during the period of time before 1989? According to Ms. Rangel, she had no contact with him before. But her son did. She bought a car. Yeah, her son had contact with him when he reached, I don't know if he was an adult yet, but he was certainly a teenager, and the dad had purchased him a car. And it's my understanding that there were times when, even though he contacted his father, he didn't discuss it with his mother. Are you claiming he was hiding? I am claiming, well, I'm claiming that he moved to the state of Texas and made no contact with Ms. Rangel purposely so that he would not have to pay support, or that the support issue would not come up, because he didn't pay anything, and he made it very clear. You know, why would it take him 18 years to decide that the best thing to do is to hide him? He had stopped paying, by your fact, 16 years before he left the jurisdiction. And even when he left the jurisdiction, there was some contact with the son. There was minimal contact, correct. Minimal or not, in 16 years, when he was living in the same city, there was no attempt to enforce this by your client. Well, she did file a petition for rule subsequent to the judgment for disillusion and bearage being entered. Very shortly after, she didn't know his whereabouts, and that was dropped, and nothing ever else was filed. So when you say there's a lapse in time that brings you here, it strikes me anyway that there was an absolute lapse of responsibility on the part of your client. If she wanted to complain about this and enforce the order, there's plenty of time to do something. Seems like she sat on her legal rights. There was plenty of time to do something if she had the ability to know his whereabouts. She testified she did not know his whereabouts, even though he was in the state of Illinois for the 19 years after the judgment for disillusion and bearage. He had no visitation, no contact with his son, so he just wasn't part of her life. She had an attorney at the time of the divorce? She had an attorney at the time of the divorce, yes, she did. So she knew how to engage an attorney if that was what her desire was? She knew how to engage an attorney. Whether or not she had the means to engage an attorney is the other question. But also the state has a facility, has legal services for people whose child support has not been paid. Yeah, and I'm not sure at that time if the state was willing to do that or not, but I know that she was. And neither was she, apparently, because she never contacted them, that the record demonstrates. She did not contact him, other than right after the disillusion of marriage, when she still had her attorney, I presume, she filed the petition for rule, which went nowhere, and I presume she was discouraged. And maybe she didn't have the funds or the ability to find him, or maybe because her discouragement and her petition for rule, which she'd even filed before the disillusion of marriage got nowhere, there was even an attachment order entered for Mr. Rangel, for Mr. Cisnero, that went nowhere. So maybe it was part of her discouragement. But that's true, she did not make any contact with him or make any effort to file anything else in the court between 1970 and 2011, when the petition was filed for enforcement. Now, the trial court denied Ms. Rangel's relief, her attempt to collect the support and maintenance, based on the statute of limitations. They denied the maintenance portion based on not only the statute of limitations, but also latches. I'd like to address the statute of limitations issue initially, and state that until 1997, July 1st of 1997, the statute of limitations was 20 years on any action that would have been brought. In July 1st of 1997, that was amended, and it was amended to allow, or to state that child support, even those child support orders that are an operation of law, may be enforceable at any time. Now, the limitations. That's correct. When the change in the statute of limitations happened, because it was procedural, it would apply to anything that would not have lapsed. Correct. It couldn't have revived anything that was already done. Now, in 1970, then, anything that wasn't filed by 1990, there would have been a lapse because of the 20 years. However, our argument is that Mr. Cisneros left the state of Illinois in 1989, so that would have told the statute of limitations in year 19. And because the statute of limitations had not run because of the tolling on July 1st of 1997, when the public act changed it and allowed for enforcement of child support orders at any time, the child support judgments were able to be enforced because of that tolling. So our position is that when the petition for rule was served on Mr. Cisneros in 2011, when he again became under the jurisdiction of the court of Illinois, in essence returned to the state of Illinois for the statute of limitations, giving Nelida Rangel time to proceed with her cause of action. Now, even if this court finds that there was no tolling of the statute of limitations, Nelida Rangel is still entitled to relief, because there were certain judgments that had not matured for 20 years. And by certain judgments, I'm talking about the case law here in Illinois that makes it very clear that if you have periodic installments, the statute of limitations does not begin to run until each installment becomes due. So in 1997, when you had the new law in effect, anything after 1977 had not began to run or had not ran. So those installments, if this court were to find that there was no tolling, those seven years of payments would be applied under the July 1, 1997 amendment. What about the latches on the maintenance issue? The Respondent alleges that he is unable to present a defense to the maintenance clause. Of course, maintenance terminates when the party receiving maintenance cohabitates. He made the allegation that she cohabitated with a man, and the hotel which provided records has now been torn down, and that your client, by waiting, prejudiced him. And he cites Bowman, the Bowman case. Your Honor, the latches argument, because he was required to show that he was prejudiced by the delay, and that he was not able to show records because of, and to show that she lived with a man. He testified that he thought she lived with a son. He thought she lived with, I think he named two different men. And Alita Rangel testified that she never lived with anybody else. And if he thought that she lived with a man, I think he would have went into court and terminated his maintenance. So you think he was guilty of latches? Well, maybe he was guilty of, I'm not suggesting latches, I'm suggesting laziness. Because he could have went in and terminated, because he's the one who had the obligation to pay. Actually, in the context of somebody who waits 40 years, laziness, with all due respect, is the wrong word here. I think you find yourself in a glass house with that argument. So I would keep the stones in your pocket. I'll keep the stones in my pocket, Justice. Thank you. Well, what is the difference between this case and Bowman? I mean, in Bowman, there was an order entered, and the gentleman died. And they said, well, he's dead, he can't do a defense. Now, what's the difference between this? Well, the second district case of Bowman, and that's the case that stood out to me as the only case I found where latches applied. And in that case, the woman came back after 60 years and tried to get child support from the estate. There was some question about whether it was support or maintenance. Right. I think the same issue here. Is it support? Is it maintenance? Is it a mixture of both? But the Court granted the defense of latches for two reasons. One, she said that it had been 60 years. They lived in neighboring counties for the entire 60 years. And he had passed away, and he was unable to even bring it into defense if there was a defense to bring. But because he had passed away, I think that was the reason that they said latches. And we have Bowman staking out one set of facts that the courts have found establishes the prejudice under latches. That's different from the facts in this case. All we know from Bowman is that if the person whose estate is being challenged is deceased, latches is found to apply because they lived in neighboring counties. It doesn't say that the other person has to have died. Moreover, in Bowman, we have something not as compelling as we have in this circumstance. Because in Bowman, there was not an assertion of any, or a suggestion, really, of any defense on the merits of the case. Where here, there is an assertion that there was indeed a defense. And there is a further assertion that because of the destruction of the hotel and the suggestion of other potential documentary evidence and other witnesses, that anyone other than the son of your client, for anything other than that, there would be no access to any evidence or discovery. So it's a different situation. But I don't think Bowman jumps out as precluding latches under these circumstances. Well, I think the Bowman case doesn't preclude it. It allows it to be undertaken by the courts as a defense. But I think the facts are not substantially similar. And I think the fact that he was deceased was the critical issue in that point. I think if Mr. Rangel, or Mr. Cisneros would have been deceased, I think maybe the judge would have said he can't even be here to give a defense. What about on that issue, the standard of review that we have to apply? I mean, we have to, to accept your argument, we have to say that the trial court abused its discretion. And it seems like the best argument that you can make here is that reasonable minds might differ on this issue and a different trial court might have found in favor of your client on the issue of latches. I don't know how you overcome the standard of review here. Well, the standard of review, as you say, is abuse of discretion. But our courts in Illinois have stated also that latches shouldn't apply if you still have time under the statute of limitations. And our tolling argument, we have four. But that's the reason for latches. The statute bars claims, but the latches comes in where the statute of limitations doesn't bar. That's the purpose of latches, is to say, okay, the claim is still good under the statute of limitations, but because of the circumstances, we're going to put latches. So what is it here? In essence, latches wouldn't have a reason to exist if you also have to have an expiration of the statute of limitations for it to apply, because by definition, there wouldn't be a live claim. Right. And my point, Justice, is because the statute of limitations has not tolled in this case, because we're still under enough time, whether it be tolled by the 20 years or whether we still have seven years of support under the amendment on July 1st of 1997. So latches shouldn't apply because it's outside of that. And you have to show not only did she sit on her rights, but then he also had the damages. Mr. Cisneros was unable to show any damages. He said he would have to take money out of his accumulated estate. He would have to make a lump sum payment. And our case law, even the Supreme Court in Finley in 1980, said an obligor, that was an obligor who unilaterally reduced his payments as the emancipation of each of his children. And it was really a construction under 510C case. And the court said that a spouse is not injured because he was forced to pay an amount that had accumulated in a lump sum because he failed to pay support payments. And there's numerous cases to say that's not an injury, is to pay a lump sum what you failed to pay in timely payments. I'm going to reserve some of your time. I would like to reserve some of my time for rebuttal. Thank you. Good morning, justices, open counsel, may it please the court. There are two reasons why this court should affirm the trial court's decision to bar Nellie Rangel's claims for child support and maintenance. The first reason is that the statute of limitations prior to existing, as it existed prior to 1997, bars both her claims under child support and maintenance because the 20 years have passed. The second reason that child support and maintenance should be barred is because of the doctrine of latches. If the statute of limitations does not apply, Mr. Cisneros has to show two things. One, dilatory, and two, actual injury or prejudice. Turning to the first point, your honors, the statute of limitations existed from 1970 through 1984 without any reference to the amendment that the General Assembly made stating that child support may be enforced at any time. Well, when does the statute begin to run on these payments? Well, we're looking at modern times how the series of judgments are taken into effect from the 1987 amendment from the General Assembly that now under 505, every child support payment as it accrues on a week or biweekly or monthly basis is an accrued judgment, and everything that runs in the judgment to the date of emancipation is a series of judgments. So the statute of limitations, to answer your question, now as it exists, would be on each payment that's missed. We're looking at the law as it existed from 1970 through 1984 until the child emancipated. Mr. Cisneros has a vested right to be protected under the laws as they existed back then. The law didn't say judgments. So Mr. Cisneros' position is that when that first payment was missed in 1971, the statute of limitations commences to run. You look at her efforts as to see if she tried to revive any of the child support payments that accrued as the child was a minor. She went into court once, and that was in February of 1970. The record's silent as to what occurred after that court date because there's no order of court that was entered. Now, if you look at the statute of limitations, now the courts, and this appellate court, Hisaputo, never addressed the issue of applying that 1997 amendment retroactively. That becomes a contention of my client because he's entitled to due process, and this amendment didn't exist. So to explain to the court, if you're divorced in 1997 and you're here in 2037, the statute of limitations that exists on 1997 applies to the child support judgment. We're trying to do the reverse. What the courts have done in Hisaputo and in Davenport in the second district is taken the 1997 amendment and applied it to a 66 divorce in Hisaputo and a 1972 divorce in Davenport. That seems to be unfair. That seems to be not justice. How is Mr. Cisneros or other abogors who didn't pay their support and admit that they didn't pay their support protected under the law? That's the position we take. Now, Mr. Cisneros, to point to the court's questions of opposing counsel, he resided in the state at the time of entry of judgment. He stayed in the state until 1989. He wasn't concealed. His son found him through the paternal grandfather by looking in the phone book. It was as simple as that. Looking in the phone book, he was able to find his paternal grandfather and meet up with Mr. Cisneros. They bought a car, and the record indicates that that car was split between that and Gilberto Cisneros. They split the cost of that car, which was $6,500. In 1989, this is after the child's emancipated. Five years after, from 1984 to 1989, this child's emancipated. The child himself helps Mr. Cisneros move to the state of Texas. So Mr. Cisneros is not concealed by no means. The record indicated that on a transcript of November 16, 2012, that Melinda Rangel was collecting public aid. She had the assistance of public aid during her childhood as a minor, and then stated she went to public aid and said that Mr. Cisneros changed his social security number. That turned out to be a frank lie. When she was asked what was Mr. Cisneros' social security number on direct examination, she couldn't even tell the court what his social security number was. So there's no reasonable explanation that's plausible for her not going to the courts from 1970 to 1984. Let alone 1984. Now you're going into the latches argument, in essence. So let me ask you about that. With the availability of Gilberto to testify, how has the expiration of the period of time actually prejudiced your client? Well, the trial court noted that neither party called Gilberto as a witness in this case. And we're moving to my second point, which latches. We know from Finley, the Supreme Court, that a money judgment is not a reason for the second element of latches, that you can't use that as a defense to show injury or prejudice, which is the second element. The 41 years she waited, that's undisputed. That's too long. We know from Baumann that case was 51 years. So is she grossly negligent for not coming to the court sooner? Absolutely. Well, the statute of limitations sets the outer limits for bringing these claims. But the latches, as we stated earlier, is a special defense. It says even where the limitations period is not expired, we're not going to let you collect because of certain underlying facts. Right. The minor here, well, the child was available to testify, yet your client did not call him to prove his case that she cohabited. How can we apply latches? You look at the totality of the circumstances under Baumann. It's not limited to just one instance. So get Baumann for a minute. Tell us how your client has been hurt when he decided not to call someone who presumably, not presumably, based on the record, at least during the period of his minority, was living with his mother to prove whether or not there was cohabitation. He can prejudice his relationship with his son. It's a fact that if he calls him as a witness, now I've turned my own son against his own mother. I mean, that's actual prejudice to his relationship with his son when you're using him to prove. Well, actually, this is not a minor at this time. He's a grown man. That's true. So all he had to do was come to court and tell the truth. I agree, but during the time frame from the judgment running in 1970 to 1984, the child's a minor. What does he know? Right. But the point is, at the time that this instant issue was brought to court, he was already, what, 45 years old? That's true. So now you're not really worrying about bruising a relationship with a minor. And presumably during the period of time in which your client contends there was cohabitation, he was living in the home with the mother. So he would be in a position, you don't have to be sophisticated, really, to be able to say there was somebody else living in the home with us. While I agree with you, you're testing the memory of a minor from the time frame that... I'm not because nobody ever called him. That's true, but there's other... Maybe that would be something to say if he was called and he said something contrary to what your client presumably would expect him to say if called. There's other factors that you can look at to terminate maintenance by operation of law. It's not necessarily cohabiting. It could be that you held yourself out with another member. We're not really speculating because the law does say it's your burden to demonstrate how you've been prejudiced. We're not here to guess whether there was some other defense other than the one that you've suggested. Cohabiting, the unavailability of records that are not available to him because she testifies she doesn't keep bank accounts that she didn't have them, she didn't have tax returns, she earned cash. So her ability to become self-sufficient cannot be proven. That's a different defense from... That would happen today and 40 years ago, the records you're talking about. What's the difference? My client would not be able to have access to full records for purposes of impeachment. Let me remind you, when you're looking at my second reason to affirm the trial court on latches, it's an abuse of discretion by the manifesto of the evidence. Here, the trial court held Nelia Rangel incredible. When you have the scales of justice, she has no evidence based on her testimony and my client's evidence and her witness are what the trial court relied on to grant the doctrine of latches against her. The trial court did not abuse its discretion. That's the standard we have to look at when you're looking at the second reason to affirm my client's decision. So, you know, to support further that, the second reason, you have also the issue that you have a judgment that was entered on fraudulent misrepresentations with regard to the trial court's temporary order that existed that said it was $35 in child support. So you also have to look at her conduct. She waits 41 years and then it becomes discovered that, hey, what happened on the day of entry of the judgment was not supposed to occur because it was her representations through her attorney that there was an order of court that actually reserved maintenance. Let me ask you this. Your client alleges that he knew about this cohabitation years ago. I'm going to ask you now. The petitioner in this case went to court, presented her case in court, got her order. Your client knew about a defense he had but sat on his hands. Didn't do anything for 40 years. Instead of latches being applied to the petitioner, it should be applied to your client, isn't it? That wasn't raised as a counterdefense to his defenses when we were at the trial court. So the court would be dealing with that now. There was some testimony from Alicia, the witness, that Ms. Rangel was having conversations with her about her problems with her boyfriend. And in two instances my client testified that in 1995 he went to the baptism at his son's party and he saw her groping with another man in the yard. But that's not grounds to terminate support. That's not grounds. But again, when you look at the manifest way of the evidence, she denied it and she was held incredible, not my client. So that's what you're looking at under the second reason, the manifest way of the evidence. When you get a simple denial, deny, deny, deny, deny, you know, he's got the burden to prove that she was living. And after 40 years, witnesses are unavailable. It's almost impossible to get witnesses to go back that far, to get tax records, to get bank records, to show that there was a commingling of funds after her denial. And that's why he has to be afforded some equal protection here. The level of the playing field is all on her side when she denies. So it burdens my client to prove his defenses and get all the documents. I mean, he has a court order ordering him to pay money. I agree, he didn't pay it. And he has a defense to get that to stop, yet he doesn't do anything for 40 years. But, you know, it seems like they were pretty good at the not doing anything. She's the one who had the order. But that's true. But she actually presented her case in court. She actually presented her case in court. And he didn't go to court to present his defense. Let's put it this way. All of us are spending a whole lot more time thinking about what should be done about this than apparently either side did during 40 years. I agree. We have the first paragraph of the opinion. And the court should set some kind of deterrent. These people were at peace for 40 years. And when people are at peace for 40 years and now you come back, it shocks the conscience. What are you doing here 41 years later and asking for something that accrued 25 years ago? You ask any person on the street. She's coming back from a 1970 judgment and it's kind of like, really? What? Why now? And that's the biggest question. Thank you very much. Thank you, Your Honor. Just very briefly, I just want to point out that the critical inquiry is the prejudice when we're talking about the latches. And in the Davenport case, which is as recent as 2009, there was a 26-year delay in filing. The court said she found out where he was, she filed when she thought it was prudent. And they very clearly stated in their ruling that this is not the type of inequitable result the doctrine of latches is designed to prevent. This is nonpayment of support. This is an issue which is critically important in current times and even in 1970. But to allow somebody to testify under oath they've paid no support and bar him by the term of latches absent a showing, he testified, I may have had records, I may have been able to find out from the hotel. There was no evidence that there was any. His injury in his affidavit was that his accumulated estate would be diminished to provide Ms. Rangel with the windfall. And I believe that latches should not apply in this case. He testified about cohabitation. He testified about other defensive matters. But as far as latches is concerned, the inquiry about his injury was not prevalent in this testimony. It was not brought forth in the case. So we would ask that this trial court's judgment finding the statute of limitations bar her claim to child support be reversed. And her judgment, the trial court's judgment that latches and the statute of limitations bar Nelida's maintenance collection also be reversed. I'm finished if you have no further questions. Thank you very much.